**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

|  |  |  |
|---|---|---|
| DONNA J. CODY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19-cv-3057 |
| | ) | |
| ANDREW SAUL, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Donna J. Cody appeals from the denial of her application for

Social Security Disability Insurance Benefits (Disability Benefits) under Title

II of the Social Security Act.  42 U.S.C. §§ 416(i) and 423.  This appeal is

brought pursuant to 42 U.S.C. § 405(g).  Cody filed a Brief in Support of

Motion for Summary Judgment (d/e 14).  The Defendant Commissioner

filed a Motion for Summary Affirmance (d/e 18).  The Plaintiff filed a Reply

to Defendant's Motion for Summary Affirmance (d/e 19).  The parties

consented to proceed before this Court.  Consent to the Exercise of

Jurisdiction by a United States Magistrate Judge and Reference Order

entered August 5, 2019 (d/e 13).  For the reasons set forth below, the Decision of the Commissioner is affirmed.

## STATEMENT OF FACTS

Cody was born on November 4, 1955.  She secured a GED and previously worked as salesperson, telemarketer, and delivery person. She last worked in 2010 and alleged she became disabled on January 1, 2013 (Onset Date).  The last day she was insured for Disability Benefits was December 31, 2015 (Last Date Insured).  Cody suffers from degenerative disc disease, diabetes, neuropathy, sleep apnea, fatigue, obesity, and depression.  Certified Transcript of Proceedings before the Social Security Administration (d/e 8 and 9) (R.), at 13, 18-22, 30, 60, 390.

On February 9, 2012, Cody saw her primary care physician Dr. Alan Richardson, M.D.  Dr. Richardson noted that Cody recently suffered from right wrist swelling, warmth, and pain. X-rays revealed osteoarthritis.  R. 717.  On examination, Cody had mild swelling and warmth in the posterior aspect of the right wrist.  Dr. Richardson prescribed prednisone.  R. 718.

On January 8, 2013, Cody saw Dr. Richardson for back pain that radiated down her left leg. She reported that the pain had gotten worse over the previous several weeks.  Cody had difficulty sleeping and walking, and her leg felt numb.  She saw a chiropractor but got no relief from

chiropractic treatment.  R. 681.  On examination, Cody had 4/5 strength throughout her left leg.  Straight leg testing was positive on the left leg. Dr. Richardson assessed sciatica.  Dr. Richardson prescribed, hydrocodone and prednisone and scheduled Cody for physical therapy.  R. 682.

On February 19, 2013, Cody saw Dr. Richardson again for her sciatica.  Cody reported that her condition had not changed.  She reported numbness and weakness. Physical therapy did not help.  Prednisone did not relieve the pain.  R. 678.  On examination, Cody's lower lumbar spine was tender; straight leg testing was negative; and pinprick sensation was intact.  Dr. Richardson ordered an MRI of Cody's lumbar spine.  R. 679.

On April 25, 2013, Cody saw Dr. Maria Carolina Espejo, M.D., for low back pain.  R. 669.  Cody said she had chronic back issues.  The pain became worse during the six months preceding the visit.  The pain radiated to her left buttock, thigh, and calf, and was worse when standing.  The pain in her left lower extremity was worse in the morning and subsided with walking.  She said that her pain varied from 4 out of 10 to 10 out of 10. She did not report any numbness or weakness.  She had trouble sleeping with the pain and the pain was worse after standing for long periods.

On examination, Cody was 5 feet 1 inch tall and weighed 213 pounds with a body mass index (BMI) of 40.22.  Cody was oriented and her mood

and affect were normal. She had nonspecific soreness on palpation of the midline lower spine and normal range of motion in her lumbar spine and her hips. Her muscle bulk and tone were normal, and her strength was normal. Straight leg testing was normal. Her coordination was normal. 669-70.

Dr. Espejo noted that Cody had an MRI of her lumbar spine on February 25, 2013. The MRI showed degenerative changes at all levels of lumbar spine except L1 and L2; mild central canal stenosis at L4 and L5; mild anterolisthesis of L5 relative to L4; bilateral foraminal stenosis at L5 and S1; and disc osteophyte complex with facet hypertrophic changes and spondylolisthesis at L5 and S1. R. 670. Dr. Espejo assessed chronic low back pain with left lower extremity radicular pain, lumbar spondylosis, spondylolisthesis of the lumbar region, diabetes, and hypothyroidism. Dr. Espejo prescribed transforaminal epidural steroid injections and blocks at L5-S1 and L4-L5. Cody agreed to the recommended treatment. R. 670-71; 1067.

On September 5, 2013, Cody saw Dr. Espejo for a follow-up. Dr. Espejo had administered injections into Cody's spine on July 22, 2013. Cody reported at this time her pain was 1 out of 10. Cody was very happy with her response to the injections. Her radicular pain in her left leg was

gone.  On examination, Cody was in no apparent distress and her gait was normal.  R. 632-33.

On January 6, 2014, Cody saw podiatrist Dr. Duane Hanzel, D.P.M., for a swollen right great toe.[1]  Cody had an ingrown toenail on her right great toe with pain, swelling, redness and drainage.  R. 853.  On examination, Cody's sensation was intact to light touch, vibration, and monofilament testing.  Dr. Hanzel assessed ingrown toenail and controlled diabetes.  R. 854.  Dr. Hanzel debrided Cody's right great toe.  R. 855.

On February 12, 2014, Cody saw Dr. Richardson for pain and numbness in her left leg.  She said she was otherwise doing well.  R. 934.  On examination, Cody was 5 feet 1 inches tall and weighed 210 pounds, with a BMI of 39.67.  Her cervical nodes were normal and not tender.  The sensory examination of both feet was normal. R. 936.  Dr. Richardson recommended that Cody exercise to lose weight and boost her good cholesterol.  R. 937.

On March 13, 2014, Cody saw Dr. Espejo for a follow-up.  Cody reported that her lower extremity pain had recurred.  The pain had been worse since December 2013.  She reported pain with numbness and

---

[1] Some of the records list Dr. Hanzel's credential as M.D., and some as  D.P.M.  Compare R. 854 (M.D.) with R. 1313 (DPM).  The Court uses the D.P.M. designation based on the treatment provided but notes the inconsistency in the record.

tingling, but no weakness.  She had pain in the morning before getting up.

The pain diminished after she was up and walking.  Dr. Espejo said that the

injections Cody previously received were effective in relieving her pain but

worked temporarily.  R. 879.  On examination, Cody's ambulation was

within normal limits.  Her toe walking was painful on the left side.  Manual

muscle testing and sensory testing was normal in Cody's lower extremities,

and her reflexes were symmetrical.  Her straight leg testing was negative.

Dr. Espejo ordered another MRI of Cody's lumbar spine and referred Cody

to an orthopedic surgeon for a consult.  R. 880.

On April 7, 2014, Cody had an MRI of her lumbar spine.  The MRI

showed no herniations; a grade 1 isthmic spondylolisthesis at L5-S1 similar

to the February 25, 2013 MRI; neural foraminal narrowing at L5 similar to

the February 25, 2013 MRI; and a disc bulge at L4-L5.  R. 735.  An April

17, 2014 x-ray of Cody's lumbar spine showed severe L4-L5 degenerative

disc disease, and grade 2 anterolisthesis of the L5 relative to S1,

apparently due to bilateral pars defect and degenerative disc disease.  R.

821-22.

On October 4, 2014, Cody saw state agency psychologist Dr. Frank

Froman, Ed.D. for a mental status examination.  Cody said that she grew

up in Springfield, Illinois.  She quit school in the 10th grade.  R. 866-68.  On

examination, Cody was oriented with good contact with reality. Her estimated IQ was in the 80s. Cody said that she could work if not for her back pain. Her back pain affected her walking, balance, and stability. Cody said she felt depressed. She felt dysthymic with a sense of foreboding and dread. Her depression affected her sleep. Dr. Froman assessed major depressive disorder—single episode, and low normal to normal intellectual functioning by interview. Dr. Froman concluded:

> **CONCLUSIONS:** Based only on psychological factors, in spite of her depression, Donna appears able to perform one or two step assemblies at a competitive rate. She is still able to relate adequately to others, understand oral and written instructions and manage benefits. From a psychological viewpoint alone, she is able to withstand the stress associated with customary employment.

R. 868.

On August 11, 2014, state agency physician Dr. Richard Lee Smith, M.D. prepared a Physical Residual Functional Assessment of Cody. R. 137-39. Dr. Smith opined the following. Cody could lift 20 pounds frequently and 10 pounds occasionally; sit about six hours in an eight-hour workday; stand and/or walk about six hours in an eight-hour workday; occasionally climb ladders, ropes, and scaffolds; avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards. R. 137-38.

On February 1, 2015, Cody completed a Function Report—Adult form for the Social Security Administration (Function Report).  R. 443-50.  Cody said the following in the Function Report.  She could not sit, stand, bend, or lift because of her backpain.  She could not sleep because of her sleep apnea.  She also was up all night due to diabetes, stress, and depression.  During the day, she checked her blood sugar, ate breakfast, made the bed, rested, watched television, prepared supper, and watched more television.  R. 443-44.  She had trouble bending to put on socks and to wash herself.  She had no other difficulties with her self-care.  She prepared simple meals on a daily basis and ate more frequently because of her diabetes and her medications.  Cody did the laundry, dishes, and light cleaning.  She did not do yard work.  She drove three to four times a week.  She went grocery shopping twice a week for an hour at a time and could manage her finances.  R. 445-46.  Cody had no social activities.  R. 447.  She opined that she could walk a few blocks.  She said that she could not pay attention, but she finished what she started.  She followed instructions "pretty well."  R. 448.  She got along with authority figures "well—fair."  She did not handle stress well and she did not handle changes in routine.  She got "depressed or stressed out over changes or not being able to do things."  R. 449.

On February 11, 2015, chiropractor Dr. Jeffrey King, D.C., completed a form entitled Arthritic Report (Degenerative or Inflammatory). R. 1034-36. Dr. King diagnosed multiple disc herniations in lumbar spine with arthritis. He based this on his February 9, 2015 examination of Cody and the April 7, 2014 x-ray report discussed above. R. 1034, 1037-38. Dr. King said Cody had pain, tenderness, and stiffness in her lumbar spine; redness and warmth in her sacroiliac joints; as well as swelling, fatigue, fever, malaise, and weight loss. Dr. King said Cody had ankylosis, edema, and atrophy and that Cody had pain, numbness, and weakness in her thumbs. Dr. King opined to the following. Cody was limited in performing: repetitive reaching, handling, and fingering; grasping, turning, and twisting objects; holding utensils; fine manipulations; and overhead reaching. Dr. King found that Cody had abnormal ambulation but did not need an assistive device to ambulate. Dr. King opined that Cody could stand or walk for about half-an-hour; could not lift 10 pounds; could sit, stand, or stretch for 10 to 20 minutes "tops;" and could not stay seated or standing for long periods. R. 1034-36.

On March 25, 2015, Cody saw Dr. Richardson for fatigue and weakness. Cody said the fatigue and weakness started the previous week. She was sleeping a lot, very fatigued with no energy. She reported

recurrent vertigo.  Dr. Richardson described her report of vertigo as chronic, intermittent, and sporadic.  Cody reported dizziness, and bouts of being more off balance that occurred once every three weeks.  R. 1266.  On examination, the Hallpike maneuver was negative each ear down.  R. 1268.[2]  Dr. Richardson assessed fatigue, orthostasis, balance problem, and vertigo.[3]  He recommended an MRI of Cody's brain and a neurological consult.  R. 1269.

On April 1, 2015, Cody saw nurse practitioner Kelly Rife at the FastCare facility at Blessing Hospital in Quincy, Illinois.  Cody complained of sinus pressure and drainage.  Cody had the sinus problems for five or six days and also reported sporadic dizzy episodes.  Rife noted that Cody had a history of type 2 diabetes and chronic sinusitis.  Rife assessed sinusitis and prescribed an antibiotic and saline nasal spray.  R. 1304.

On April 22, 2015, Cody saw Dr. Hanzel due to discomfort in her hallux, or big toe, nails.[4]  The nails were ingrowing and slightly reddened.  Dr. Hanzel noted serous drainage and assessed diabetes, paronychia, and

---

[2] Hallpike maneuver is a test for benign positional vertigo.  Dorland's Illustrated Medical Dictionary (32nd ed. 2012) (Dorland's), at 1102.

[3] Orthostasis is lowered blood pressure on standing up. See American Academy of Physical Medicine and Rehabilitation, Orthostasis, located at https://www.aapmr.org/about-physiatry/conditions-treatments/medical-rehabilitation/orthostasis, viewed February 28, 2020.

[4] See Dorland's, at 818.

ingrown nail.[5]  Dr. Hanzel debrided the nails of the hallucis, or big toes, bilaterally.  R. 1305.

On April 23, 2015, Cody saw state agency physician Dr. Joseph J. Kozma, M.D., for a consultative examination.  R. 1187-92.  Cody reported that she previously did clerical work.  She could not do that work anymore because of sciatic nerve problems in both legs.  She said the pain worsened over time.  She rated her pain as ranging from 7/10 to 9/10.  She also said she had sleep apnea.  She could not use a continuous positive airway pressure (CPAP) machine because she could not wear the mask. She reported stiffness in her neck and pain when she turned her head.  R. 1187.  She also reported having diabetes and depression.  R. 1188.

On examination, Cody was 61 inches tall and weighed 207 ½ pounds.  Cody had no tenderness in the cervical spine and the cervical paravertebral muscles had normal tone without rigidity.  She had normal strength in her upper extremities except for 3/5 grip strength bilaterally.  Dr. Kozma noted that Cody did not make a maximum effort in the grip strength examination.  Her finger dexterity was normal.  Her lower extremities had normal strength with no tenderness, swelling, or crepitus in any joint.  Cody had mild tenderness in her lower dorsal spine.  The paravertebral muscles

---

[5] Paronychia is an inflammation of the skin around the fingernails or toenails.  See Dorland's, at 1384.

had normal tone.  Her thoracic spine was not tender.  Her reflexes were decreased, but not abnormal, and her equilibrium was normal.  Pinprick sensation was intact.  Heel and toe walking were unsteady but within normal limits.  She could squat half-way.  Her straight leg raising was decreased due to stiffness in her lower extremities.  She had no abnormalities in her gait. Her posture was normal, and she had no postural abnormalities.  R. 1188-89.

Dr. Kozma noted that Cody was oriented and had a stable emotional state.  Her intellectual functions were intact, and her thought content and communications were appropriate.  R. 1191.  Dr. Kozma noted that Cody's diabetes was not under control because her hemoglobin A1c was over 7.  Dr. Kozma assessed diabetes, poorly controlled; and chronic low back pain with sciatic involvement bilaterally secondary to bulging disc.  R. 1191.

On April 29, 2015, state agency physician Dr. Sumanta Mitra, M.D., prepared a Physical Residual Functional Capacity Assessment.  R. 152-54.  Dr. Mitra opined the following.  Cody could lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; occasionally climb ladders, ropes, and scaffolds; and should avoid concentrated exposure to

extreme cold, fumes, odors, gases, poor ventilation, and hazards. R. 152-54.

On May 22, 2015, Cody's boyfriend Roger Adair completed a form entitled, "Third Party Statement of Ability to do Daily and Work-Related Activities." R. 475-77. Adair said the following. He knew Cody for 25 years. She could not work due to back pain, inability to sleep, and trouble with diabetes symptoms. She had a hard time walking after getting up from a chair or bed, however, she did not need to use a cane, walker, or wheelchair. Cody could walk for 15 minutes, stand down for 10 minutes, and sit for 20 minutes. She had difficulty vacuuming, dusting, sweeping, scrubbing floors, mowing, and making beds. She did not have difficulty washing dishes, doing the laundry, or cooking. Cody felt stressed almost daily. She acted appropriately in public, and did not have any difficulty understanding, remembering, or carrying out simple instructions. R. 475-77.

On May 24, 2015, Cody's friend and former co-worker Rahna Schwengel also completed a Third Party Statement of Ability to do Daily and Work-Related Activities form. R. 479-81. Schwengel said the following. She knew Cody for 12 years. Cody could not work because she was not able to sit or stand for long periods due to problems with her back

and feet.  She did not use a cane, walker, or wheelchair.  She could walk for 10 minutes, stand for 15 to 20 minutes, and sit for 20 minutes.  Cody can pick up one pound with one hand and two to three pounds with both hands.  Cody was stressed daily with pain and difficulties paying for her medications.  She acted appropriately in public and did not have difficulty understanding, remembering, or carrying out simple instructions.  R. R. 479-81.

On June 3, 2015, Cody saw Dr. Hanzel with left heel pain.  On examination, Cody had a palpable vein medial calcaneal tubercle in the left heel.  She had significant discomfort on palpation.  Dr. Hanzel assessed type 2 diabetes and plantar fasciitis and prescribed medication and padding in her shoes for arch support.  R. 1313.

On September 8, 2015, Cody saw Dr. Richardson for her yearly health maintenance visit.  Cody's lab results were excellent.  She had some tingling in her toes.  R. 1243.  Examination of her feet showed normal appearance and normal vibratory sensation.  R. 1246.

On September 9, 2015, Cody had x-rays taken of the right foot.  Dr. Hanzel ordered the x-ray to check for a foreign body in the foot.  The x-ray showed no fracture, no malalignment, and no foreign body in the foot.  R. 1335.

On October 27, 2015, Cody saw Dr. Luis Zayas, M.D. for a neurology follow-up visit.  R. 1240.  Cody had recently been diagnosed with breast cancer.  She reported that she had not had a spell of vertigo since June 10, 2015.  She reported no more episodes of postural lightheadedness.  She was still having three to four headaches a week, usually in the morning.  Dr. Zayas said that the headaches could be related to her sleep apnea.  He noted that Cody could not tolerate a CPAP machine.  R. 1240.  On examination, Cody was oriented and had normal speech, comprehension, memory, attention, and fund of knowledge.  She had normal motor muscle tone and 5/5 strength throughout.  She had mildly decreased pinprick sensation in the feet.  She had a normal gait.  Dr. Zayas assessed depression, history of tension headaches, sleep apnea, vertigo, and chronic low back pain.  He recommended avoiding caffeine and beginning or continuing regular aerobic exercise, gradually working up to three 30-minute sessions a week.  R. 1240-41.

On November 4, 2015, Cody saw Dr. Hanzel for thickened and discolored toenails.  Cody reported numbness, tingling, and a burning sensation in her feet.  R. 1355.  On examination, Cody had an antalgic gait and pain in her left foot, but full range of motion and normal strength.  All of Cody's toenails were ingrown, discolored, and tender.  Her feet had

decreased response to light touch and vibration, but normal response to monofilament testing.  Dr. Hanzel diagnosed diabetic neuropathy and ingrown toenails.  R. 1356.  Dr. Hanzel debrided the toenails.  R. 1357.

On March 17, 2016, Cody saw Dr. Andrew Dunn, D.O., to establish care as her primary care physician.  Cody said her diabetes was stable and controlled.  She denied any numbness or pain in her feet.  R. 1394.  On examination, her neck was supple, and her thyroid was not enlarged.  She had a normal gait and her affect and mood were normal.  Dr. Dunn assessed obesity, type 2 diabetes, and hypothyroidism.  Dr. Dunn noted that her diabetes was controlled.  R. 1396.

On July 18, 2016, Cody saw Hanzel for a sore right toe.  On examination, Cody was in no acute distress.  She had an antalgic gait, ingrown toenails, and left mid tarsus pain and arthritic changes; but she had full range of motion and normal strength.  Cody had decreased response to light touch and vibration, but normal response to monofilament testing.  Dr. Hanzel assessed diabetes with polyneuropathy, and paronchia of the toe of the right foot and trimmed Cody's toenails.  R. 1505-06.

On August 9, 2016, Cody saw optometrist Dr. Kirk Kvitle, O.D., for a diabetic eye examination.  Dr. Kvitle found no vision issues related to diabetes.  R. 1466-68.

## THE FIRST EVIDENTIARY HEARING

On November 7, 2016, the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  R. 54-87.  Cody appeared with her counsel.  Vocational expert Dr. Jeff Magrowski, Ph.D., also appeared.  R. 56.

Cody testified to the following.  She lived in Quincy, Illinois, with her boyfriend.  She had a driver's license and drove three times a week. She drove 30 minutes to the hearing.  She stopped during this trip to stretch.  She could drive for 20 minutes before she needed to stop and stretch.  She needed to stretch after sitting for that time.  Her regular driving trips to the doctor or shopping were all 20 minutes or less. R. 59.

Cody previously worked full time as a telemarketer.  She could not return to the job because she could not sit for long periods and she could not stand up when she worked in telemarketing.  She could not stand for long periods because "the disc in my back are, are bad, they're deteriorating and I have the sciatica where the pain shoots down my leg."  R. 62.  She also had difficulty working because she had problems sleeping.  R. 76.  Cody waited several years after she stopped working in 2010 to apply for disability.  She waited to see if she would get better first.  She did not get better.  R. 66-67.

Cody had pain in her feet from her neuropathy symptoms from her diabetes.  She did not have pain in her feet in 2013.  Since then the pain started in 2014 or 2015, it has since gotten worse.  She had burning, tingling pain in her feet and the pain could go on for an hour or two. She alleviated the pain by propping up her feet and keeping pressure off them. Sitting in a chair aggravated her neuropathy.  R. 67-68.

Cody said that she had a herniated disc and back pain in 2013.  The back pain was a stabbing pain when she stood and pressure when she sat. The pain radiated down both legs.  She experienced radiating pain down her legs every day and the pain lasted one to two hours.  She alleviated the pain by stretching and putting up her legs.  Cody tried injections for her back pain.  The injections worked "a little bit."  The pain relief was temporary, lasting two to three months.  R. 67-69.

Cody had chronic sinus infections every month.  She regularly took antibiotics for the infections.  She has undergone allergy testing, MRIs, and CT scans, but "no one has yet to find out what causes this."  R. 69. The infections caused fever, weakness, and fluid build-up in the ear.  Typically, she had symptoms for five or six days, then went to the doctor to get antibiotics, and the symptoms thereafter lasted seven to 10 days, "[T]hen it comes right back."  R. 70.

Cody experienced dizziness with sinus infections.  She also experienced dizziness "out of the clear blue."  She could not walk when she was dizzy and the dizziness also caused nausea.  She took meclizine for the dizziness.  She took meclizine once a month.  R. 69-70.

Cody underwent breast cancer surgery on October 29, 2015.  She finished the post-surgery radiation treatments in February 2016.  She suffered fatigue from the radiation treatments.  The fatigue from the radiation made her prior fatigue worse.  She already had fatigue because sleep apnea and chronic sinusitis interfered with her sleep.  R. 65-66.

Cody could not use a CPAP for her sleep apnea because the CPAP mask made her sick.  She tried several different masks with the same results.  She did not use oxygen or take medication for her sleep apnea.  R. 66.

Cody also had hypothyroidism and she took medication for the condition.  She said that the condition added to her fatigue.  R. 71.

Cody said that she suffered from fatigue when she was working in 2010.  She missed work three to four times a month because of fatigue and she was hospitalized for chronic fatigue at some point.  Her fatigue was connected to "the diabetes, the thyroid, just a combination of everything." R. 71. She was called into her employer's office several times for her

absences, but she was never written up for them.  She quit working because she could not take the pain.  R. 71-72.

Cody also suffered from acid reflux and took medication daily for this condition.  She vomited three to four times a week due to her acid reflux and the acid reflux interfered with her sleep.  R. 72.

Cody had problems sleeping.  She could not get comfortable in bed due to pain.  Once she fell asleep, she woke up "every other hour every night."  She napped two to three times during the day because she did not sleep well at night.  R. 73.  Each nap lasted an hour to an hour and a half and she napped in the recliner.  Cody spent most of her time during the day in the recliner.  R. 73.  Cody's sleeping problems were longstanding, extending back to when she was working in 2010 and before.  R. 76.

Cody could not lift more than three to five pounds without pain.  She could not bend, squat, or stoop and her son helped her with housework.  R. 74.

Cody went grocery shopping with her son and her son did all the heavy lifting.  She walked at the grocery store on short shopping trips.  She was on her feet no more than 15 to 20 minutes during shopping trips and she used a motorized cart for longer shopping trips.  She used the motorized cart about three times a week.  R. 63-64, 74.

Cody was depressed because "I'm not able to do what I used to do." R. 74-75. She was on medication for depression, but she went off the medication when she underwent treatment for her breast cancer. She had not gone back on her antidepressant medication at the time of the hearing. R. 75. Cody's testimony concluded.

Dr. Magrowski then testified. Cody's lawyer stipulated to Dr. Magrowski's qualifications to testify as an expert witness. R. 77. Dr. Magrowski testified that Cody's prior relevant work was as a retail salesclerk, telemarketer, and as a delivery driver. The retail salesclerk and telemarketer were light work and the delivery driver was medium work. Dr. Magrowski further stated that based on Cody's testimony, her telemarketer job was really an order clerk job, which was a sedentary job. R. 77-78. The ALJ asked Dr. Magrowski to assume a person of Cody's age, education, who had the following functional capacity:

> [A]ssume the individual could perform work at the light exertional level occasionally lifting up to 20 pounds, frequently lift and carrying up to 10 pounds, standing, walking six hours out of an eight-hour workday and sitting six hours out of an eight-hour workday. No more than occasional climbing of ropes, ladders or scaffolds and the person should avoid concentrated exposure to pulmonary irritants such as gas, fumes, odors, dust, and poor ventilation, the person should avoid concentrated exposure to extreme cold and work hazards such as unprotected heights and being around dangerous, moving machinery. Any past work available?

R. 78.

Dr. Magrowski opined that such a person could perform Cody's past relevant work as a retail salesclerk as the job was performed in the national economy. He also opined that the individual could perform the order clerk job as it was performed in the national economy and that the individual could perform these jobs even if the person could only tolerate occasional interaction with supervisors. R. 79. If the person also needed an option to alternate between sitting and standing, then the person could only perform the order clerk job as it was performed in the national economy. R. 80.

Dr. Magrowski said the person could maintain employment only if the person was on task at least 88% to 90% of the time. He opined that the person could be absent three to five days a year and maintain employment. Dr. Magrowski opined that the person could not maintain competitive employment if the person had to elevate his or her legs during the workday and that the person could not maintain employment if the person needed an extra 30-minute break beyond the standard breaks allowed in an eight-hour workday. R. 84-86.

### THE FIRST DECISION OF THE ALJ AND APPEAL

The ALJ entered her decision on December 22, 2016. R. 159-73. The ALJ followed the five-step analysis set forth in Social Security

Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.

Step 1 requires that the claimant not be currently engaged in substantial

gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2

requires the claimant to have a severe impairment.  20 C.F.R. §§

404.1520(c), 416.920(c).  If true, Step 3 requires a determination of

whether the claimant is so severely impaired that she is disabled

regardless of her age, education and work experience.  20 C.F.R. §§

404.1520(d), 416.920(d).  To meet this requirement at Step 3, the

claimant's condition must meet or be equal to the criteria of one of the

impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1

(Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so

severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work

considering her age, education, work experience, and Residual Functional

Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If

the claimant cannot return to her prior work, then Step 5 requires a

determination of whether the claimant is disabled considering her RFC,

age, education, and past work experience.  20 C.F.R. §§ 404.1520(g),

404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of

presenting evidence and proving the issues on the first four steps.  The

Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy. 20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found at Step 1 that Cody had not engaged in substantial gainful activity since the Onset Date; at Step 2 that she had severe impairments of degenerative disc disease, diabetes, and polyneuropathy; at Step 3 that her impairments or combination of impairments did not meet a Listing; at Step 4 that she had an RFC to perform a limited range of light work, and she could perform her prior work as an order clerk as generally performed in the national economy. The ALJ concluded that Cody was not disabled. R. 164-73.

Cody appealed to the Social Security Appeals Council. On July 28, 2017, the Appeals Council reversed and remanded the first decision of the ALJ. R. 183-84.

On remand, the ALJ allowed Cody to submit additional evidence. Cody submitted additional medical records, including a June 27, 2017, office visit with Dr. Dunn for a follow up on her diabetes. Cody's blood

sugars were running 130 to 180. Her hemoglobin A1c had been trending down. She reported back pain and muscle pain; but no joint pain, neck pain, joint swelling, muscle cramps, or tingling. R. 1639. Dr. Dunn assessed type 2 diabetes, obesity, hypertension, and acute sinusitis. Dr. Dunn prescribed medication for the sinusitis and noted that Cody's blood pressure was at goal. Dr. Dunn left Cody's diabetes medication, hypothyroid medication, and other medications, unchanged. He scheduled a follow-up in three months. R. 1641-42.

## THE SECOND EVIDENTIARY HEARING

On May 21, 2018, the ALJ conducted a second evidentiary hearing. Cody appeared with her attorney. A medical expert Dr. Lee Fischer, M.D., and vocational expert Julie Beck also appeared. R. 88-131.

Dr. Fischer testified first. Cody's attorney stipulated that Dr. Fischer was qualified to testify as a medical expert in this case. R. 93. Dr. Fischer reviewed the entire medical file that was before the ALJ and opined that Cody had the following severe impairments:

> The claimant has diabetes mellitus and she has extreme obesity, she's about 5' 1" and over 200 pounds, hypertension, sleep apnea, diabetic peripheral neuropathy, lumbosacral degenerative disease, breast cancer, left-sided breast cancer and a history of cirrhosis of the liver and I believe she has hypo or low thyroidism as well and that's all, Your Honor.

R. 94-95.  Dr. Fischer opined that none of Cody's impairments, either separately or in combination, met or equaled a Listing.  Dr. Fischer opined that Cody's RFC was limited to sedentary work, primarily due to degenerative disc disease, neuropathy, and obesity.  R. 95-96, 99-100.

Dr. Fischer opined that Cody's breast cancer did not have a long-term impact on her functional abilities through the Date Last Insured of December 31, 2015.  R. 96-98.  He said her hypothyroidism was controlled with medication.  R. 96.  He said that the records did not show that Cody's diabetes was so uncontrolled that it would affect her functional abilities to work apart from the peripheral neuropathy accounted for in the sedentary exertional limitation.  R. 98-99. Dr. Fischer said that the record did not show Cody had additional functional limitations from her sleep apnea because the records did not show that she suffered daytime sleepiness due to her sleep apnea.  R. 97.  Dr. Fischer said that Dr. Kozma's notation of an unsteady gait would not change his opinion on her ability to perform sedentary work.  R. 101.

On examination by Cody's attorney, Dr. Fischer stated that he did not examine Cody and did not know her treating health care professionals.  Dr. Fischer agreed that Cody's breast cancer medication anastrozole can cause dizziness and fatigue, but Dr. Fischer testified that those side effects

are temporary until the person became accustomed to the medication. R. 102. Dr. Fischer testified that Cody's thyroid medication prevented her from becoming fatigued due to hypothyroidism. R. 103. He said that he found no diagnosis for her use of the anti-dizziness medication meclizine. R. 103. Dr. Fischer reiterated his opinion that the medical records did not show a level of uncontrolled diabetes that would affect Cody's functional abilities apart from the neuropathy. R. 104-05. He further testified that he did not believe the medical evidence supported Dr. King's opinions on Cody's functional limitations. R. 105-06.

Cody then testified. She described her past work. R. 107-12. Cody testified that she had problems with her sugar levels due to her diabetes from 2013 to 2015, "It was every month it would be up or down and they adjusted my insulin, they could add more and then he finally, and they would add more medication, more diabetic medication. And then he finally gave me two shots and increased the insulin to try to keep it under control." R. 113-14. She still experienced sugar highs and lows after she got two insulin shots a day. R. 114.

Cody said she had problems sleeping due to her sleep apnea, "Ever since I tried using the CPAP machine I don't sleep well at all at night and I'm usually up three or four times . . . during the night." R. 114. She said

she took two to three naps a day and each nap lasted 15 to 30 minutes.  R. 117.

Cody had to take her breast cancer medication for ten years.  She said her feet swelled due to the cancer medication, as well as the neuropathy.  She had pain in her feet every day and had to elevate her feet to relieve the pain, numbness, and tingling.  R. 115.  She could not work even if she could alternate between sitting and standing because she did not sleep well at night, and so, could not concentrate.  R. 116.

Cody said she took meclizine for dizziness.  Her dizziness made her nauseous to the point of vomiting and the meclizine took about 30 minutes to resolve a dizzy spell.  R. 117-18.  She had dizzy spells a couple of times a month.  R. 118.

Vocational expert Beck then testified.  Cody's attorney stipulated to Beck's qualifications as a vocational expert.  R. 120.  Beck testified that Cody previously worked as a telemarketer at the sedentary level, a salesperson at the light level, and a delivery person at the medium level.  R. 121.  The ALJ then asked Beck the following hypothetical question:

> And so then, Ms. Beck, if you assume a hypothetical individual with those past jobs, same age as the claimant, 57 at the onset, 62 now and same education, a GED, and if the person was reduced to sedentary exertional level but no climbing on ropes, ladders or scaffolds, occasional climbing on ramps and stairs, stooping, kneeling, crouching or crawling. The person should

avoid concentrated exposure to pulmonary irritants such as gas, fumes, odors dust and workspace with poor ventilation, and should avoid concentrated exposure to extreme cold and work hazards such as unprotected heights and being around dangerous moving machinery. And I'm going to say like standing and walking no more than 30 minutes at a time. Any past work available?

R. 123-24. Beck opined that the person could performed Cody's prior work as a telemarketer as that job is described in the Department of Labor's Dictionary of Occupational Titles (DOT). R. 124.

Beck said the person could not do the telemarketer job if she could not deal with the public at work. The person could be off-task up to 10 percent of the time at work and maintain employment. She said the person could be absent one day a month and maintain employment. R. 128. Beck said that the telemarketer job would not allow any additional breaks beyond the usual allowed for all such employees. The telemarketer job would not allow the person to elevate her legs during work. R. 130. Beck's testimony ended, and the hearing concluded.

## SECOND DECISION OF THE ALJ

The ALJ issued her second decision on August 1, 2018, R. 15-30. The ALJ again followed the Analysis discussed above. The ALJ found that Cody met her burden at Steps 1 and 2. Cody did not engage in substantial gainful activity from her Onset Date to her Date Last Insured and she

suffered from the severe impairments of degenerative disc disease of the lumbar spine and type 2 diabetes with polyneuropathy. The ALJ also considered Cody's obesity throughout Steps 2 through 5. R. 18. The ALJ decided at Step 3 that Cody's impairments or combination of impairments did not meet or equal a Listing. R. 22.

At Step 4, the ALJ found that Cody had the following RFC:

> After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except for the following nonexertional limitations that reduce the claimant's capacity for sedentary work: can never climb ladders, ropes, or scaffolds; can no more than occasionally climb ramps or stairs; can no more than occasionally stoop, kneel, crouch, or crawl; must avoid concentrated exposure to pulmonary irritants, such as gas, fumes, odors, dust and workspace with poor ventilation; must avoid concentrated exposure to extreme cold and work hazards, such as unprotected heights or being around dangerous moving machinery; standing or walking no more than thirty minutes at a time; and must be able to alternate between sitting and standing positions every thirty to sixty minutes for a few minutes at a time while remaining at the workstation with no loss in production.

R. 22. The ALJ relied on the opinions of Drs. Fischer, Smith, and Mitra; the examinations of Dr. Kozma and psychologist Dr. Froman; and the numerous medical examinations that showed gait and station within normal limits, normal sensory function, negative straight leg testing, the ability to walk without assistive devices, normal strength, and normal muscle tone.

R. 25-26.  The ALJ discounted Cody's testimony about her limitations because they were not supported by the medical record and because they were inconsistent with the level of activity she described in her February 1, 2015 Function Report.  R. 27.

The ALJ gave limited weight to Dr. King's opinions and noted that Dr. King was a chiropractor, and so, not an acceptable medical source.  See 20 C.F.R. § 404.1527(d).  The ALJ relied on Dr. King's statement that Cody could walk without an assistive device and could work a job that allowed her to change positions.  The ALJ said that his opinions on her ability to use her hands or his opinions regarding her ability to lift, sit, stand, and walk were not supported by the medical evidence in the record. R. 28.  The ALJ concluded that Cody could perform the limited range of sedentary work set forth in the RFC quoted above.  R. 29.

The ALJ determined at Step 4 that Cody could perform her past work as a telemarketer.  The ALJ relied on the opinions of vocational expert Beck and the DOT description of the telemarketer job.  R. 30.  The ALJ found that Cody was not disabled at Step 4.

Cody appealed.  On January 3, 2019, the Appeals Council denied Cody's request for review.  The ALJ's August 1, 2018 decision then

became the final decision of the Defendant Commissioner.  R. 1.  Cody

then brought this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine

whether it is supported by substantial evidence.  Substantial evidence is

"such relevant evidence as a reasonable mind might accept as adequate"

to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).

This Court must accept the findings if they are supported by substantial

evidence and may not substitute its judgment or reweigh the evidence.

Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782

F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation

of statements regarding the intensity, persistence, and limiting effect of

symptoms unless the evaluation is patently wrong and lacks any

explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351,

367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008);

SSR 16-3p, 2017 WL 5180304, at *1 (October 25, 2017) (original version at

2016 WL 1119029 (March 16, 2016)) (The Social Security Administration

no longer uses the term credibility in the evaluation of statements regarding

symptoms).  The ALJ must articulate at least minimally her analysis of all

relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).

The ALJ must "build an accurate and logical bridge from the evidence to his conclusion." Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision is supported by substantial evidence. Dr. Fischer's testimony, in particular, supported the ALJ's RFC analysis. Cody stipulated to Fischer's qualifications to testify as a medical expert. Dr. Fischer reviewed the entire set of medical records presented to the ALJ. He opined that she could perform sedentary work. His opinions were further supported by the opinions of Drs. Smith and Metra. The three medical opinions were also supported by several examinations that showed normal functional findings in strength, muscle tone, and range of motion. The three opinions and the medical evidence cited by the ALJ provided substantial evidence to reject the opinions from Dr. King that found Cody was more limited functionally.

Cody argues that other medical evidence in the record supports a more limited RFC. Cody is essentially asking the Court to reweigh the evidence. Specifically, the Plaintiff argues that if "the ALJ gave proper weight to Plaintiff's testimony" the ALJ would conclude that the Plaintiff could not perform the sedentary work identified by the vocational expert. (d/e 14, p 14) The Court cannot reweigh the evidence. Jens, 347 F.3d at 212; Delgado, 782 F.2d at 82. Dr. Fischer looked at all the evidence and

concluded Cody could perform sedentary work. The underlying medical records cited by the ALJ and the opinions of Drs. Smith and Metra supported Dr. Fischer's conclusions. The ALJ credited this evidence. The Court will not reweigh the evidence to second-guess the ALJ's decision.

Cody argues that the ALJ improperly relied on her daily activities to conclude that she could work. The Court disagrees. The ALJ considered her description of her activities in her Function Report to evaluate Cody's claims about the disabling effects of her impairments; the ALJ did not equate her activities with competitive work activities. The ALJ must consider daily activities in evaluating Cody's testimony about the limiting effects of her symptoms. 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, at *7. The ALJ gave little weight to Cody's testimony because her testimony about her disabling limitations was not consistent with her description of her daily activities in her Adult Function Report and was not consistent with the opinion of Dr. Fischer and the other medical evidence in the record on which the ALJ relied. <u>See</u> R. 27. Such inconsistencies are a proper basis for giving less weight to a claimant's statements:

> [I]f an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities . . . .

SSR 16-3p, at *8. The ALJ properly considered Cody's daily activities in evaluating the limiting effect of her symptoms. The RFC finding was supported by substantial evidence.

The RFC finding and the opinions of vocational expert Beck supported the conclusion that Cody could perform her prior work as a telemarketer. Thus, the decision of the ALJ at Step 4 that Cody was not disabled was supported by substantial evidence.

THEREFORE, IT IS ORDERED that Defendant Commissioner's Motion for Summary Affirmance (d/e 18) is ALLOWED, Plaintiff Donna J. Cody's Brief in Support of Motion for Summary Judgment (d/e 14) is DENIED, and the decision of the Commissioner is AFFIRMED. THIS CASE IS CLOSED.

ENTER: March 26, 2020

s/ *Tom Schanzle-Haskins*

TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE